```
              IN THE UNITED STATES DISTRICT COURT FOR
              THE DISTRICT OF MARYLAND, NORTHERN DIVISION

                               *
UNITED STATES OF AMERICA
                               *
          v.                       CRIMINAL NO.: WDQ-08-0086
                               *
STEVE WILLOCK, et al.
                               *

*    *    *    *    *    *    *    *    *    *    *    *    *
```

MEMORANDUM OPINION

On February 21, 2008, the grand jury returned a 20 count indictment against Michelle Hebron, Sherman Pride, Ronnie Thomas, and others.[1]  All the defendants were charged in Count One with Conspiracy to Participate in a Racketeering Enterprise.  Pride was charged in Count Two with Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances. Pending are various pretrial motions.  A motions hearing was held on November 5, 2009.

I.   Motions for Bills of Particulars (Paper No. 388)

Hebron moved for a bill of particulars under Fed. R. Crim. P. 7(f).  Thomas has adopted Hebron's motion.[2]  Paper No. 679.  A

---

[1] Hebron, Pride, and Thomas are scheduled for trial on January 19, 2010. This Memorandum Opinion resolves motions made or adopted by the defendants in the January 19 trial group.

[2] Each of the defendants has moved to adopt a number of co-defendant motions.  The motions to adopt request procedural (i.e., permission to adopt the co-defendant's motion) and substantive (i.e., the relief sought by the co-defendant's motion) relief.  The procedural relief requested in all the motions to adopt will be granted.  When the substantive relief

bill of particulars is appropriate when an indictment fails (1) to provide adequate information to allow a defendant to understand the charges and (2) to avoid unfair surprise.  *See United States v. American Waste Fibers Co.*, 809 F.2d 1044, 1047 (4th Cir. 1987).  Providing discovery is not a basis for a bill of particulars.  *United States v. Automated Med. Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985) ("A bill of particulars is not to be used to provide detailed disclosure of the Government's evidence in advance of trial.").

The 49-page Indictment allows the defendants to understand the charges.  Each count states the controlling statutes, relevant dates, and facts supporting the charge.  Count One, conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. 1962(d), describes the history, purpose, and operations of the Tree Top Pirus ("TTP")(a subset of the Bloods gang), the allegedly criminal "enterprise" with which the defendants allegedly were associated.  Count One alleges 117 "overt acts" in furtherance of the conspiracy.  The overt acts allege dates, details, and each defendant's connection to the alleged enterprise.  The other counts also allege the elements of the charges and the dates on which they allegedly occurred.

The Government has provided thousands of pages of documents, video and audio surveillance, lists of witnesses, expert reports,

_____

sought in a motion to adopt is denied, the motion will be GRANTED

and defendant statements.  Govt. Opp. to Mot. for Bill of
Particulars 3-4.  The Government has also given a "reverse
proffer" to Thomas in which the Government summarized its
evidence and Thomas's relationship to the TTP.  The defendants
understand the charges against them, and there is little risk of
surprise at trial.  Accordingly, the motions for bills of
particulars will be denied.

II.  Motion to Dismiss Count One of the Indictment (Paper No.
     568)

     Thomas (Paper No. 679) and Pride (Paper No. 681) adopted co-
defendant Anthony Fleming's motion to dismiss Count One,
Conspiracy to Participate in a Racketeering Enterprise in
violation of 18 U.S.C. § 1962(d) ("RICO").  Under RICO, it is
"unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect,
interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity."  *Id*. §
1962(c).  Section 1962(d) makes it unlawful for any person to
conspire to violate § 1962(c).

     A RICO conviction requires proof of an "enterprise" and a
"pattern of racketeering activity."  *See* 18 U.S.C. § 1961(1).  An
"enterprise" includes "any union or group of individuals
associated in fact."  *Id*. § 1961(4).  An "association-in-fact

---

IN PART and DENIED IN PART."

enterprise" requires proof of: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose. *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009). A "pattern of racketeering activity," requires proof of two predicate acts of "racketeering activity," as that term is defined in 18 U.S.C. § 1961(1). The Government need not prove that each defendant committed two predicate acts; it is sufficient if two such acts were committed by any member of the conspiracy. *See Salinas v. United States*, 522 U.S. 52, 64-66 (1997).

Count One alleges that the TTP is a RICO enterprise. Its 117 "overt acts" in furtherance of the enterprise demonstrate a pattern of racketeering activity. The defendants moved to dismiss Count One on the grounds that (1) the Government has no evidence of an identifiable structure that could constitute an "enterprise" and (2) even if there is evidence of an "enterprise," there is no evidence showing that they had a role in it.[3]

"The longstanding rule of law that courts may not 'look

---

[3] The motion also argued that there was insufficient evidence connecting Overt Act 3 (the alleged murder of Lamont Jackson by Fleming and Tavon Mouzone) to the alleged enterprise. As the Government will not present evidence of the Jackson murder at the January 11, 2010 trial, the Court will not rule on this aspect of the motion.

behind' grand jury indictments if 'returned by a legally constituted and unbiased grand jury' is the touchstone for any inquiry into the legality of indictments."[4]  The Fifth Amendment requires only "an indictment returned by a legally constituted and unbiased grand jury." *Mills*, 995 F.2d at 487.  "If [the indictment is] valid on its face, [it] is enough to call for trial of the charges on the merits." *Id*.  "The Supreme Court has clearly indicated its unwillingness to second guess the decision of a grand jury to formally accuse an individual brought before it based upon some incriminating evidence." *Id*.

Facial validity requires compliance with the Fifth and Sixth Amendments and Fed. R. Crim. P. 7(c)(1).  "To pass constitutional muster, an indictment must (1) indicate the elements of the offense and fairly inform the defendant of the exact charges and (2) enable the defendant to plead double jeopardy in subsequent prosecutions for the same offense." *United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998).  Rule 7(c)(1) merely requires "a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7.

The motions do not challenge the facial validity of the indictment or the legality of the grand jury.  Rather, they argue

---

[4] *United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1993) (*quoting Costello v. United States*, 350 U.S. 359, 363 (1956)). The *Costello* Court was urged, but declined to hold, that defendants may "challenge indictments on the ground that they are not supported by adequate or competent evidence." *See Costello*,

that the Government's charges are not supported by sufficient evidence.  As the Court may not "look behind" a valid indictment to assess the sufficiency of the evidence against a defendant, the motions must be denied.

III. Ronnie Thomas[5]

    A.    Motion to Suppress Electronic Surveillance (Paper No. 441)[6]

        1.    Background

In November 2006, the Baltimore City Police Department ("BPD") and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began an investigation of drug trafficking by the TTP.  Govt. Opp. 2.  From August 2007 to February 2008, the

---

350 U.S. at 364.
[5] Thomas has filed a: Motion for Disclosure Pursuant to Fed. R. Evid. 404(b) (Paper No. 442); Motion for Disclosure Pursuant to Fed. R. Crim. P. 12 (Paper No. 445); Motion for Disclosure of All Materials Relating to Proposed Expert Testimony (Paper No. 446); and Motion for Disclosure Pursuant to Fed. R. Evid. 801(d)(2)(E) (Paper No. 448).  Thomas also adopted co-defendant Jerrod Fenwick's motions for disclosure of confidential informants (Paper No. 436) and for Fed. R. Crim. P. 16 evidence (Paper No. 641).  Paper No. 679.  In its October 28, 2009 and December 17, 2009 letters, the Government informed the Court that the materials requested in these motions have been disclosed. Accordingly, the motions will be denied as moot.

Thomas also moved for leave to file additional motions after the close of discovery (Paper No. 443) and for leave to adopt motions of other co-defendants (Paper No. 444).  In its October 28, 2009 letter, the Government did not oppose either motion. Accordingly, the motions will be granted.

[6] Pride has adopted this motion (Paper No. 681), but, as the Government's response indicates, he has not alleged standing, *i.e.*, that his communications were intercepted.  Accordingly, his motion to suppress will be denied for lack of standing.

Circuit Court for Baltimore City authorized wiretaps of cellular telephones of alleged TTP members Kevin Gary, Sean Frazier, and Jerrod Fenwick. *Id*. In August 2007 and October 2008, the Circuit Court authorized interceptions on the "A-Line" and "J-Line," cellular telephones used by Gary. *Id*. Communications from Thomas were intercepted on the J-Line. *See* Hr'g Tr. 156:4-17, Nov. 5, 2009. (statement of Michael Montemarano, Esq., counsel for Ronnie Thomas). He moves to suppress, arguing that the J-Line affidavits did not establish probable cause or the exhaustion of normal law enforcement techniques. Paper No. 441.

> 2. Analysis

"When a state court authorizes a wiretap, state wiretapping law should govern the admissibility of wiretap evidence in federal court." *United States v. Bullock*, 2000 U.S. App. LEXIS 1000, *14 (4th Cir. Jan. 27, 2000) (*citing United States v. Glasco*, 917 F.2d 797 (4th Cir. 1990)). Because Maryland law is identical to federal law on the subjects of probable cause and exhaustion, "whether [the Court] analyzes this case under state or federal law is of little consequence." *Id*. Section 10-408 of the Courts and Judicial Procedure Article of the Maryland Code authorizes a wiretap when the applicant shows (1) probable cause for belief that an individual is committing, has committed or is about to commit an enumerated offense; (2) probable cause for belief that particular communications concerning the offense will

be obtained through such interception; (3) that normal investigative procedures have been tried and have failed or appear to be unlikely to succeed or are too dangerous; and (4) probable cause for belief that the facilities from which the communications are to be intercepted are being used in connection with the commission of such offense.  Md. Code Ann., Cts. & Jud. Proc. § 10-408.

> a.   Probable Cause

"The probable cause required for issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a search warrant." *United States v. Talbert*, 706 F.2d 464, 467 (4th Cir. 1983).[7]  An affidavit is assessed on the "totality of the circumstances." *Gates*, 462 U.S. at 238.  An officer's report in his affidavit of the target's prior criminal activity or record is material to the probable cause determination.  *United States v. Bynum*, 293 F.3d 192, 197-98 (4th Cir. 2002).

The A-Line and J-Line affidavits[8] show that Gary was a

---

[7] Probable cause to search is "a fair probability" that evidence of a crime will be revealed by the search.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Ornelas v. United States*, 517 U.S. 690, 696 (1996)(probable cause exists "whe[n] the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that . . . evidence will be found").

[8] The application for the J-Line Order was partly based on the A-Line affidavit, and the latter is incorporated into the J-Line affidavit by reference.  J-Line Aff. ¶ 17.  Thus, the Court has examined both affidavits in deciding whether a sufficient showing of probable cause was made as to the J-Line Order.

member of the TTP, an organization involved in drug-trafficking in Maryland.[9]  A-Line Aff. ¶¶ 17, 19.  The A-Line affidavit described telephone conversations between Gary and Steve Willock, alleged leader of the TTP, about various TTP matters, including plans for Gary's travel to contact TTP members in Compton, California.[10]  Id. ¶¶ 27-33.  Gary's "MySpace" webpage indicated his affiliation with the TTP, including his residence in "Pirumore, Maryland" and praise for the "Piruettes," (*i.e.*, female TTP members).  *Id*. ¶ 34.

The A-Line affidavit also described Gary's arrangements to sell heroin and his sale of crack cocaine to a confidential informant ("CI-206") whom Gary and other TTP members had accepted as a fellow Blood.  *Id*. ¶¶ 35, 46, 47, 48.  CI-206, who had learned Gary's cell phone number--the A-Line number--at a July 8, 2007 TTP meeting, *id*. ¶ 59, called Gary to arrange the heroin deal.  *Id*. ¶ 46.

The A-Line affidavit also cited Dialed Number Recording ("DNR") Data for August 3, 2007 to August 19, 2007 showing more

---

[9] Possession with intent to distribute controlled dangerous substances and related crimes are among the enumerated offenses for which a wiretap order may be issued.  *See* Md. Code Ann., Cts. & Jud. Proc. § 10-406 (12).

[10] The conversations took place while Willock was incarcerated in Hagerstown, Maryland and were recorded pursuant to Maryland Division of Corrections policy.  The recordings were shared with the A-Line affiants.  A-Line Aff. ¶ 25.

than 7,100 direct connect "activations" of the A-Line cell phone-
-more than 400 per day--suggesting "commercial" use of the phone.
*Id*. ¶ 62.  Finally, the A-Line affidavit documented Gary's
criminal record, including a 2001 conviction for possession with
intent to distribute cocaine and heroin.  *Id*. ¶ 67.  The A-Line
affidavit established probable cause to believe that (1) Gary was
engaged in the sale of controlled dangerous substances in
violation of Maryland law and (2) communications concerning
Gary's drug sales would be intercepted on the A-Line.

The J-Line affidavit states that CI-206 reported that Gary
had discarded the A-Line cell phone and began using the J-Line
phone in early October 2007.  J-Line Aff. ¶ 34.  The affiants
compared outgoing calls on the A-Line and J-Line and found 26
common numbers, suggesting that Gary had used both lines.  *Id*. ¶
34.  DNR data on the J-Line for October 1, 2007 to October 28,
2007 showed 9,930 activations--354 per day--suggesting
"commercial" use.  *Id*. ¶ 42.  The A-Line affidavit and this
information established probable cause that (1) Gary was
violating Maryland's drug laws and (2) communications about his
drug sales would be intercepted on the J-Line.

10

b.    Exhaustion

Like its federal counterpart, § 10-408(c)'s exhaustion requirement was enacted "to make doubly sure that the statutory authority [to wiretap] is used with restraint and only where the circumstances warrant . . . surreptitious interception." *Salzman v. State*, 49 Md. App. 25, 32, 430 A.2d 847, 853 (Md. Ct. Spec. App. 1981) (*quoting United States v. Giordano*, 416 U.S. 505, 515 (1974)). "[T]he exhaustion requirement's basic purpose is to assure that wiretapping is not . . . routinely employed as the initial step in [a] criminal investigation." *Id*. Thus, "[t]he affidavit must demonstrate . . . that normal investigative procedures have been tried and failed, or they are unlikely to be successful, or that their use is too perilous to the investigators." *Id*.

Law enforcement "need not exhaust every conceivable investigative possibility before seeking a wiretap order." *Id*. Rather, "the exhaustion requirement is to be tested in a practical and common sense fashion." *Id*. Although the Government cannot show exhaustion "through a mere boilerplate recitation of the difficulties of gathering useful evidence," *United States v. Oriakhi*, 57 F.3d 1290, 1298 (4th Cir. 1995), the burden on the Government is "not great," and courts should be wary of reading the requirement in an overly restrictive manner lest they unduly hamper the investigative powers of law enforcement agents.

11

*United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994).

The J-Line affidavit met the exhaustion requirement.  The affidavit detailed specific obstacles to the investigation:

> [T]he goals and objectives of this investigation are to develop evidence sufficient to identify, locate, arrest and convict . . . the criminal confederates of the CDS trafficking organization in which GARY is involved . . . [and to] indentify the organization's suppliers and the means by which the organization obtains and receives CDS, and to determine where the organization stores CDS and how it processes and launders CDS proceeds.

J-Line Aff. 30.  The affiants noted that although two confidential informants had been useful in obtaining evidence about Gary's drug sales, they had not learned the TTP's sources of supply, methods of distribution, stash house locations, or the manner of concealment and laundering of CDS proceeds.  *Id*. 31. As the TTP prided itself on its violence,[11] the affiants believed it was too dangerous to have the informants press Gary for this information.  *Id*.

The affidavit demonstrated that the introduction of an undercover officer was unlikely to succeed.  *Id*. 33.  According to the informants, Gary balked at meeting people who were not affiliated with the Bloods.  *Id*.  And even if the informants were able to introduce an undercover officer, it was unlikely that the officer would gain information not already available to the informants.  *Id*.  The TTP's violence also counseled against using

---

[11] Gary had boasted to CI-206 that in 2005, TTP was responsible

an undercover officer. *Id.* 33-34.

The affidavit demonstrated that cooperation of TTP associates was unlikely, and attempts to interview them would compromise the investigation. *Id.* 34-35. Similarly, the execution of search warrants at TTP members' homes could prompt the TTP to suspend operations and cause the targets to dispose of monitored phones. *Id.* 35-36. The TTP was a small, tightly knit group. *Id.* 34. The arrests of top-level members Jerrod Fenwick and Shonn Eubanks may have increased the TTP's vigilance for law enforcement. *Id.* 36. Approaching other targets or their associates or executing multiple search warrants would have been dangerous and could have caused the destruction of evidence. *Id.* 34-35. Witness interviews were also unlikely to succeed because the potential witnesses were implicated in CDS distribution and/or feared for their safety. *Id.* 39-40.

Grand jury subpoenas were also unlikely to succeed. *Id.* 38-39. The potential witnesses were themselves TTP members. *Id.* Those witnesses would have likely asserted the Fifth Amendment privilege against self-incrimination before the grand jury. *Id.* 38. As the State's Attorney for Baltimore City had decided that no TTP member would receive immunity, the testimony of these witnesses could not be compelled. *Id.* 39.

Surveillance of Gary was unlikely to succeed. *Id.* 36.

---

for 75% of Baltimore's 300 murders. A-Line Aff. ¶ 49.

Because of the arrests of Fenwick and Eubanks, Gary was "maintaining a very low profile at his mother's house." *Id.* Physical surveillance of Gary was thus unlikely to reveal TTP suppliers and the means by which the TTP received CDS, where CDS was stored, and how the TTP processed and laundered CDS proceeds. *Id.* Placing GPS tracking devices on Gary's cars would have risked compromising the investigation because of Gary's "extreme[] aware[ness] of law enforcement's efforts to discover his illegal activity." *Id.* 38. Because Gary used more than one vehicle--and the vehicles he used were used by others--the value of GPS tracking was outweighed by the risk of exposing the investigation. *Id.*

Finally, although telephone toll records (*i.e.*, DNR data) on the J-Line had been helpful, the call data did not reveal the identities of many of the callers. *Id.* 40. The affiants believed that listening to the telephone conversations was necessary to learn those identities. *Id.*

Viewed in a practical, commonsense fashion, the affidavit adequately informed the Baltimore City Circuit Court judge of the difficulties involved in using conventional law enforcement techniques and why those techniques were unlikely to achieve the goals of the investigation. The J-Line Order was based on probable cause and the exhaustion requirement had been satisfied. Thomas's motion to suppress the wiretap will be denied.

14

B.    Motion for Severance (Paper No. 447)[12]

Thomas is charged in Count One with Conspiracy to Partici-
pate in a Racketeering Enterprise.  He argues that he should be
tried separately because (1) the evidence against his co-
defendants is greater than the evidence against him, and (2) the
Government will likely introduce Fed. R. Evid. 404(b) evidence
against co-defendants that would be prejudicial to him.

Under Fed. R. Crim. P. 8(b), "defendants may be charged in
the same indictment if they are alleged to have participated in
the same act or transaction or in the same series of acts or
transactions constituting an offense or offenses."  "Barring
special circumstances, individuals indicted together should be
tried together."  *United States v. Singh*, 518 F.3d 236, 255 (4th
Cir. 2008).  Indeed, unless a "miscarriage of justice" will
result, there is a presumption that co-defendants should and will
be tried together.  *Richardson v. Marsh*, 481 U.S. 200, 206-11
(1987).  This presumption is especially strong in conspiracy
cases.  *United States v. Harris*, 498 F.3d 278, 291 (4th Cir.
2007).

Fed. R. Crim. P. 14 permits severance "[i]f it appears that
a defendant . . . is prejudiced by a joinder . . . of defendants.
. . for trial together."  Severance is only required when "there
is a serious risk that a joint trial would compromise a specific

---

[12] Pride has adopted Thomas's motion.  Paper No. 681.

15

trial right of one of the defendants or prevent the jury from
making a reliable judgment about guilt or innocence." *Zafiro*,
506 U.S. at 539.  Severance is not required merely because the
evidence against one or more defendants is stronger--or more
inflammatory--than evidence against other defendants.  *See Singh*,
518 F.3d at 255; *Harris*, 498 F.3d at 291-92.  The defendant must
"establish that actual prejudice would result from a joint trial
. . . not merely that a separate trial would offer a better
chance of acquittal." *United States v. Reavis*, 48 F.3d 763, 767
(4th Cir. 1995).

Thomas has not overcome the presumption--especially strong
in conspiracy cases--that defendants charged together should be
tried together.  That the evidence against his co-defendants may
be stronger and more inflammatory than the evidence against him
does not entitle him to severance.  Accordingly, Thomas's motion
to sever will be denied.

C.   Motion to Suppress Statements (Paper No. 636)

1.   Background

On February 28, 2008, between 9:00 a.m. and 10:00 a.m.,
Thomas was arrested on a warrant for this Indictment.  Gov. Opp.
1; Hr'g Tr. 116:16-19, 117:1-3, Nov. 5, 2009.  He was taken to
the ATF's Baltimore Field Office, and interviewed by ATF Special
Agent Gabriel Mamock and two other agents.  Hr'g Tr. 116:16-19.
The interview began at 10:03 a.m.  *Id.* 117:4-7.  Mamock advised

16

Thomas of his rights under *Miranda v. Arizona*. *Id*. 118:17-23. Mamock also showed Thomas an Advice of Rights waiver form that contained the *Miranda* warnings. *Id*. 119:9-13. He explained to Thomas that if he wanted to speak with the agents, he had to acknowledge that his rights had been explained as specified on the form. *Id*. 19:19-25. Thomas indicated that he understood his rights by printing and signing his name on the waiver. *Id*. 120:1-25. After signing the waiver, Mamock showed Thomas the Indictment, and Thomas made several statements about the allegations contained in it. *Id*. 121:12-124:23.

The interview lasted approximately 30 minutes. *Id*. 125:1-4. Thomas never indicated that he wished to remain silent or speak with an attorney. *Id*. 121:1-11. Nor did Thomas complain of discomfort or ask for assistance from Mamock. *Id*. 125:116-19.

    2.  Analysis

*Miranda v. Arizona*, 384 U.S. 436 (1966), requires that the police inform the suspect that he has the right to remain silent and the right to the presence of an attorney before any "custodial interrogation". *See Miranda*, 384 U.S. at 479. When a suspect in custody has invoked his right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

A waiver of *Miranda* rights must be voluntary, knowing and intelligent. *Moran v. Burbine,* 475 U.S. 412, 421 (1986).  A waiver is voluntary, knowing, and intelligent if it was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.; see also United States v. Cristobal,* 293 F.3d 134, 139-40 (4th Cir. 2002).  The Court engages "in the same inquiry when analyzing the voluntariness of a *Miranda* waiver as when analyzing the voluntariness of statements under the Due Process Clause," *Cristobal,* 293 F.3d at 140, that is, the Court asks whether "the defendant's will has been overborne or his capacity for self-determination critically impaired because of coercive police conduct." *Id.*

The unrebutted evidence is that Thomas (1) signed a waiver form, (2) was not coerced by Mamock or the other agents, and (3) never indicated that he wished to remain silent or invoke his right to counsel.  Accordingly, his motion to suppress statements will be denied.

18

IV.  Sherman Pride[13]

    A.  Motion for Production of Agents' Notes (Paper No. 601/755)

Under Fed. R. Crim. P. 16, Pride seeks all notes taken by agents who have interviewed him.  The Government has provided discovery relating to its witnesses and intends to produce witnesses' notes.  Pride's motion is moot, and it will be denied.

    B.  Motion to Strike Aliases (Paper No. 649)[14]

Each defendant has at least one alias listed in the style and text of the Indictment.  Pride is referred to as "SHERMAN PRIDE, a/k/a Dark Black, a/k/a DB" in the style and in Counts One and Two.  "Dark Black" is mentioned in ¶ 25(9). "DB" is mentioned in ¶ 25(41) and (43).  Pride requests that the Government be prevented from referring to him by the aliases until it has presented evidence that he was known by them.

---

[13] Pride has filed motions for leave to file out of time (Paper No. 601), to adopt motions of co-defendants (Paper Nos. 601 and 752), and to file additional motions after the close of discovery (Paper Nos. 601 and 753).  As the Government has not opposed these motions, they will be granted.

Pride also adopted co-defendant Jerrod Fenwick's motions for disclosure of confidential informants (Paper No. 436) and for Fed. R. Crim. P. 16 evidence (Paper No. 641) and Thomas's motions for disclosure of materials related to expert testimony (Paper No. 446) and disclosure of co-defendant statements under 801(d)(2)(E) (Paper No. 448).  Paper No. 681.  In its December 17, 2009 letter, the Government informed the Court that the materials requested in these motions have been disclosed to Pride.  Accordingly, the motions will be denied as moot.

[14] Thomas has adopted this motion.  Paper No. 679.

"If the Government intends to introduce evidence of an alias and the use of that alias is necessary to identify the defendant in connection with the acts charged in the indictment, the inclusion of the alias in the indictment is both relevant and permissible, and a pretrial motion to strike should not be granted." *United States v. Clark*, 541 F.2d 1016, 1018 (4th Cir. 1976). "However, if the prosecution either fails to offer proof relating to the alias or the alias, though proven, holds no relationship to the acts charged, a motion to strike may be renewed, the alias stricken and an appropriate instruction given the jury." *Id*.

The Government has indicated that it will introduce evidence of the defendants' aliases because they rarely used their real names when communicating with each other. For example, the Government intends to use intercepted prison mail in which the defendants and their associates refer to each other by aliases. Because such evidence is relevant, Pride's motion will be denied. "[S]hould the Government fail to offer proof relating to the alias or the alias, though proven, holds no relationship to the acts charged," the motion may be renewed and an appropriate jury instruction will be given.

C.   Motion to Suppress Tangible Evidence (Paper No. 601/756)

Pride moved to suppress all evidence seized from a gray Chevrolet Malibu during his August 22, 2007 arrest on the ground that the seizure violated the Fourth Amendment.[15]  At the November 5, 2009 motions hearing, Assistant United States Attorney Michael Hanlon stated that he had conferred with Pride's counsel, Harry D. McKnett, Esquire and that Pride lacked standing to challenge the seizure of the evidence on Fourth Amendment grounds.  Hr'g Tr. 150:9-17.  Mr. McKnett was present and did not object to this statement.  Accordingly, Pride's motion to suppress will be denied.

D.   Motion in *Limine* Regarding the August 22, 2007 Incident (Paper No. 648)

Pride also moves under Fed. R. Evid. 401 and 402 to preclude the Government from proving the incident leading to the August 22, 2007 arrest[16] at trial because it is irrelevant.[17] He argues

_____

[15] Pride's motion refers to a June 4, 2009 arrest, but the Indictment and the Government's response refer to an August 22, 2007 incident that involved Pride.  The testimony at the November 5, 2009 evidentiary hearing on Pride's motion to suppress statements was about August 22, 2007.  The Court will therefore assume that the reference to the June 4 arrest is a typographical error.

[16] According to the Government's opposition to Pride's motions (Paper Nos. 601, 648 and 756), police responded to a call about a domestic dispute involving Pride in Salisbury, Maryland.  Govt. Opp. to Mot. in Limine 2.  Police also received information that Pride had placed a yellow bag into a gray Chevrolet Malibu (which was driven by other persons) just as police were arriving. *Id.* The officers stopped the Malibu, searched the yellow bag, and

that the incident is irrelevant because the Government has not
provided discovery that connects it to the racketeering
conspiracy charged.  The Government responds that the grand jury
found the incident was in furtherance of the conspiracy.  The
Government also notes that Pride is charged in Count Two,
Conspiracy to Distribute and Possess with Intent to Distribute
Controlled Substances, including cocaine like that found in the
bag that Pride allegedly threw into the Malibu.

Evidence is relevant if it has "any tendency to make the
existence of any fact that is of consequence to the determination
of the action more probable or less probable that it would be
without the evidence."  Fed. R. Evid. 401.  If Pride possessed
large amounts of controlled substances on August 22, 2007, that
fact may be "of consequence" to a determination of whether Pride
was part of (1) a racketeering enterprise engaged in large-scale
drug trafficking and (2) a conspiracy to possess and distribute
drugs. *See, e.g.*, *United States v. Stoke*, 64 Fed. Appx. 352, 356
(4th Cir. 2003).  Accordingly, Pride's motion in *limine* will be

discovered marijuana and cocaine.  *Id*.  The Indictment alleges
that on the date of this incident, August 22, 2007, "Pride
possessed with the intent to distribute 65 grams of cocaine
base."

[17] Pride's motion begins by requesting that the Government be
precluded "from making any reference to . . . Pride's arrest on
August 22, 2007," but the motion as a whole makes clear that
Pride is seeking to exclude not the fact of his arrest but the
evidence leading to that arrest.  The Indictment refers to the
recovered narcotics, not the arrest.  Indictment ¶ 25(47).

denied.

E.   Motion to Suppress Statements (Paper No. 601/754)

Pride moves to suppress statements to Officer Oscar Arce
during an interview at the Wicomico County Detention Center
("WCDC") following his August 22, 2007 arrest.  Arce did not
advise Pride of his *Miranda* rights before the interview, and
Pride argues that the failure to Mirandize requires suppression
of statements made during the interview.  The Government argues
that *Miranda* does not apply because Pride was not "in custody."

As the head of the WCDC's Intelligence Unit and a member of
its Gang Investigation Unit, Arce's responsibilities include
monitoring gang activity inside the WCDC.  Hr'g Tr. 134:10-14,
135:13-21.  Arce reviews the WCDC's intake log daily for persons
associated with gangs.  *Id*. 139:16-22.  When an alleged gang
member has been booked, Arce interviews the inmate about his
alleged affiliation and rank within the gang.  *Id*. 137:6-17.
This information is forwarded to the WCDC's Housing Department so
that gang members may be classified and tracked for the safety of
them and others.  *Id*.  Arce testified, "it is well-known that
gang members inside a correctional facility pose a threat to the
safety and security of the facility, so [the WCDC] keep[s] tabs"
on them.  *Id*. 139:11-15.

Arce also memorializes these interviews for the Wicomico
County State's Attorney's Office as part of an "information-

23

sharing network on gang issues." *Id*. 138:9-11, 145:4-25.[18]  The
interviews obtain information about inmates' affiliations and
ranks for use inside the WCDC, and gather information about gang
activity outside the jail to be shared with law enforcement.  *Id*.
145:19-22.

Arce relies on intelligence from other law enforcement
agencies to identify possible gang members at the WCDC. *Id*.
144:20-145:3.  The Gang Suppression Committee of the State's
Attorney's Office shares information about gang-related activity
in the county.  *Id*.  At an August 14, 2007 Committee meeting,
Arce learned of Pride's alleged affiliation with the TTP.  *Id*.
144:20-145:3.  After being arrested and transported to the WCDC
in Salisbury, Maryland on the morning of August 22, 2007, Pride
was confined in a holding cell in the WCDC's Central Booking
Unit.  *Id*. 143:12-14.  When Arce saw Pride's name on the WCDC
intake log, he summoned Pride for an interview.  *Id*. 137:22-25.

The interview was in the supervisor's office, a small,
windowless room with one door.  *Id*. 135:19-21; 135:22-136:1.
Pride was escorted to the office by a Central Booking officer.
*Id*. 137:22-25.  He was interviewed by Arce only; the unarmed
Central Booking officer remained outside the office during the
interview.  *Id*. 146:5-17.  The door was closed but not locked.

---

[18] The network includes several Wicomico County law enforcement
agencies. *Id*. 144:20-145:25.

24

*Id.* 136:7-8.  Pride was not handcuffed or otherwise restrained during the interview.  *Id.* 136:9-14.

Arce did not Mirandize Pride.  *Id.* 140:12-24.  Although Pride was not required to answer Arce's questions, Arce did not advise Pride of this.  *Id.* 146:1-6.  Pride was not free to leave the interview.  *Id.*  Arce testified that Pride seemed "relaxed" during the interview and was "very cooperative."  *Id.* 138:20.

None of the questions related to the offense for which Pride had been arrested. *Id.* 147:3-6.  Arce questioned Pride about gang-related activities, *id.* 145:13-22, and photographed Pride's tattoos, *id.* 138:23-139:1.

*Miranda* warnings must precede "custodial interrogation." *See Miranda*, 384 U.S. at 479.  This rule applies to the custodial interrogation of incarcerated persons.  *Mathis v. United States*, 391 U.S. 1, 4 (1968).[19]  In *Mathis*, the Court explained that the possibility of criminal tax proceedings was sufficient to trigger *Miranda*'s requirements and that "nothing in the *Miranda* opinion [calls] for a curtailment of the warnings to be given persons

---

[19] In *Mathis*, the Supreme Court held that *Miranda* warnings should have been given to an inmate who was questioned by Internal Revenue Service agents about allegedly falsified tax returns while serving a state sentence on an unrelated matter.  *Id.*  In a subsequent tax fraud prosecution, the Government argued that the defendant's statements were admissible because (1) the questions were asked as part of a routine tax investigation when no criminal proceedings might be brought and (2) that the defendant had not been incarcerated by the officers questioning him, but was there for a separate offense.  *Id.*

under interrogation by officers based on the reason why the person is in custody." *Id.* at 4-5.

Courts considering *Miranda*'s requirements in the prison context have read *Mathis* narrowly.  The Fourth Circuit has stated that "[p]risoner interrogation does not lend itself easily to analysis under the traditional formulations of the *Miranda* rule." *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985).[20] Thus, "[a] different approach to the custody determination is warranted." *Id.*

Recognizing that restriction of movement is relative in prison, the Fourth Circuit has "looked to the circumstances of the interrogation to determine whether the inmate was subject to more than usual restraint on a prisoner's liberty to depart." *Id.*  The Court examines the "totality of the circumstances" surrounding the interrogation.  *United States v. Jamison*, 509 F.3d 623, 629 (4th Cir. 2007).  Factors considered include the

---

[20] Because a prisoner is always "in custody" under the traditional *Miranda* formulation--"formal arrest or restraint on the freedom of movement"--application of the traditional rule would result in a *per se* finding of custody, regardless of the situation in which a prisoner was questioned.  *See id.*  This approach could "disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards which may touch on past or future criminal activity and which may yield potentially incriminating statements useful at trial."  *Id.*  This "would torture *Miranda* to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart." *Id.* (*quoting Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978)).

restraints imposed on the defendant and the nature of the
questioning by prison personnel. *Conley*, 779 F.2d at 974.

Although the post-*Mathis* cases vary in terms of their facts
and their statements of the law governing *Miranda*'s application
in prison, they are commonly motivated by a desire to avoid "the
illogical position" of providing prisoners greater rights under
*Miranda* than non-prisoners. *Cervantes*, 589 F.2d at 427. Thus,
motions to suppress statements are denied in situations where if
the questioning had taken place outside of prison, it would not
be considered "custodial interrogation."[21]

---

[21] Facts suggesting non-custodial questioning have included: (1)
the prisoner's initiation of the interview with the person to
whom he makes the incriminating statements, *United States v.
Willoughby*, 860 F.2d 15, 23 (2d Cir. 1988); *Leviston v. Black*,
843 F.2d 302, 304 (8th Cir. 1988); *United States v. Brown*, 1990
U.S. Dist. LEXIS 2226, at *7-*8 (N.D. Ill. Feb. 27, 1990), (2)
the prisoner's being told he is free to leave an interview or to
stop answering questions at any time, *United States v. Menzer*, 29
F.3d 1223, 1232 (7th Cir. 1994); *United States v. Ellison*, 2008
U.S. Dist. LEXIS 25735, at *5-*6 (D.N.H. Mar. 28, 2008);
*Willoughby*, 860 F.2d at 23, (3) informal or spontaneous
questioning, *Conley*, 779 F.2d at 973; *Cervantes v. Walker*, 589
F.2d 424, 429 (9th Cir. 1978), (4) brief and routine questioning,
*Herndon v. Smith*, 2005 U.S. Dist. LEXIS 37618, at *65-*66 (W.D.
Mich. May 23, 2005), (5) questioning in an unrestrained
atmosphere such as a prison library or conference room, *United
States v. Cooper*, 800 F.2d 412, 414 (4th Cir. 1986); *Cervantes*,
589 F.2d at 429, and (6) questioning for a purpose other than
interrogation, *Conley*, 779 F.2d at 973; *Cooper*, 800 F.2d at 414.

Facts suggesting custody include: (1) government initiation
of the questioning, *United States v. Toribio-Toribio*, 2009 U.S.
Dist. LEXIS 68699, at *2-*3 (N.D.N.Y. Aug. 6, 2009), (2) the
prisoner's being escorted to the interview by an officer, *United
States v. Chamberlain*, 163 F.3d 499, 504 (8th Cir. 1998); *United
States v. Kadem*, 317 F. Supp. 2d 239, 241 (W.D.N.Y. 2004), and
(3) the prisoner's not being free to leave or refrain from

The Fourth Circuit has twice addressed *Miranda*'s application in prison.  In *United States v. Conley*, 779 F.2d 970 (4th Cir. 1985), an inmate was stabbed to death,[22] and Conley moved to suppress statements to correctional officers regarding the incident because he had not been given his rights under *Miranda*. *Id.* at 972.  The Fourth Circuit affirmed the district court's denial of Conley's motion, finding that Conley was not "in custody" when the statements were made.  *Id.* at 973.  The court explained that:

> Conley was taken to [a] conference area primarily to await medical treatment and not for the purpose of interrogation.  The discussions were brief, and were interrupted by Conley's trip to the infirmary . . . Both officers knew Conley, addressed him by his nickname, and testified that they questioned him as a witness to, rather than a suspect in, the [inmate stabbing].  Conley had previously worked for [one of the officers] for several months and the officer testified that he and Conley were "very familiar" and on "friendly terms."  Both officers testified that

---

answering questions or--if the prisoner is free to leave and/or not answer--not being informed of those rights, *Chamberlain*, 163 F.3d at 504; *United States v. Lugo*, 289 F. Supp. 2d 790, 796 (S.D. Tx. 2003); *Toribio*, 2009 U.S. Dist. LEXIS 68699, at *2-*3.

[22] A subsequent investigation revealed that Conley had a deep cut on his wrist.  *Id.* at 971.  The cut required medical attention, so Conley was handcuffed and taken to a conference room in the prison control center to await transfer to the infirmary.  *Id.* While in the conference room, Conley initiated a conversation with two correctional officers, and a 10 to 15 minute discussion about the stabbing ensued.  *Id.*  Conley was then taken to the infirmary.  *Id.*  Thirty minutes to an hour later, Conley returned to the control center.  *Id.*  Upon Conley's return, one officer asked Conley if he was "up to [his] same old [stuff] again."  *Id.* Conley made statements about the stabbing that the Government sought to introduce at trial.  *Id.*

> Conley spoke "freely" during the interview . . . and
> that his statements were voluntarily made.

*Id.* at 973-74.  "Under the circumstances," the court concluded,

"Conley's freedom of movement cannot be characterized as more

restricted than that of other prisoners in transit to or from the

facility, either by virtue of his confinement or the nature of

the questioning by prison personnel."  *Id.* at 974.  Because

Conley was not in "custody," *Miranda* warnings were not required.

*Id.*[23]

---

[23] The *Conley* court relied principally on *Cervantes v. Walker*, 589
F.2d 424 (9th Cir. 1978), in which the defendant moved to
suppress statements in response to questioning by a corrections
officer who was moving the defendant to a new cell after a fight.
*Id.* at 426.  The correctional officer told the defendant to
gather his belongings and go to the library to speak with another
officer before the move.  *Id.*  The defendant did so, leaving his
belongings outside the library, where they were searched by the
first officer in "accordance with standard jail procedure when
moving inmates."  *Id.* at 426-27.  The officer discovered what he
believed was marijuana and took the substance into the library,
where he asked the defendant, "what's this?"  *Id.* at 427.  The
defendant replied that the substance was marijuana.  *Id.*  After
being charged with possession, the defendant moved to suppress
his statement because he had not been given his rights under
*Miranda*.  *Id.*

The Ninth Circuit affirmed the denial of the motion,
reasoning that the defendant was not in custody when he made the
statement.  The court concluded that:

> The marijuana was uncovered in the course of a routine
> search.  [The correctional officer's] question sought
> to ascertain the nature of the substance.  The
> questioning took place in the prison library and
> appears to have been a spontaneous reaction to the
> discovery.  Under these circumstances, we also conclude
> that neither the prison setting nor the presence of
> [the officers] exerted a pressure to detain sufficient

In *United States v. Cooper*, 800 F.2d 412 (4th Cir. 1986),
the defendants were charged with assaulting a correctional
officer. *Id.* at 413. Before trial, they requested to speak with
a correctional treatment specialist, and were taken to a
disciplinary board room to do so. *Id.* During the conversation,
the treatment specialist asked the defendants why they committed
the assault, and, in response, they made incriminating statements
that were admitted against them at trial. *Id.* Relying
principally on *Conley*, the Fourth Circuit concluded that the
defendants were not in custody within the meaning of *Miranda*.
Id. at 414-15. The court explained that:

> Like Conley, defendants here were taken to a
> conference area not for the purpose of interrogation
> but primarily for another reason. Specifically, they
> were taken to a disciplinary board room to converse
> with a correctional treatment specialist at their
> request. Thus, defendants were moved from their cell to
> an inherently less restrictive area. Furthermore, there

---

> to have caused a reasonable person to believe his
> freedom of movement had been further diminished.
> Rather, this was an instance of on-the-scene
> questioning enabling [the officer] to determine whether
> a crime was in progress.

*Id.* at 429.

The Fourth Circuit appears to understand *Cervantes* to mean
that *Miranda* warnings were not required because (1) the defendant
was not in custody and (2) the interrogation constituted "on the
scene questioning." *See United States v. Cooper*, 800 F.2d 412,
415 (4th Cir. 1986). If a defendant is subject to "on-the-scene"
questioning, *Miranda* warnings are not required and there is no
need to inquire as to whether the questioning was "custodial
interrogation." *See id.* at 415.

30

was testimony that one of two doors to the room
remained unlocked. Although Conley was questioned by
correctional officers or guards, defendants were
questioned by a correctional treatment specialist, an
arguably less intimidating prison representative.
Finally, it is significant that defendants were not
handcuffed; Conley wore handcuffs and, at some points,
full restraints. Overall, we  conclude that defendants
did not experience an added imposition on [their]
freedom of movement, and thus, were not in custody.

*Id*. at 414. (internal citations and quotation marks omitted).[24]

_____

[24] By contrast, in *United States v. Chamberlain*, 163 F.3d 499 (8th
Cir. 1998), the defendant, who was serving a sentence for sexual
misconduct, worked at a nonprofit corporation inside the prison
and had his own office.  *Id*. at 501.  In response to a news
report alleging financial misconduct in the corporation,
Department of Corrections ("DOC") officials commenced an
administrative investigation and searched the defendant's office.
*Id*.  The search revealed lists of children's names and addresses
and a disk that contained child pornography, which led to a later
prosecution of the defendant for possession of and conspiracy to
distribute child pornography. *Id*.

     During the administrative investigation of the corporation,
DOC officials interviewed each inmate who worked for the
corporation.  *Id*.  The defendant was interviewed twice.  *Id*.  At
the end of one interview, a DOC official asked the defendant
about the lists and disk found in his office, and the defendant
made incriminating statements that were used in the child
pornography prosecution.  *Id*.

     The Eighth Circuit held that the statements should have been
excluded because the defendant was subject to custodial
interrogation and had not been Mirandized. *Id*. at 504.  Although
(1) the interviews took place in the corporation's offices, (2)
the defendant was not restrained, and (3) the door to the officer
remained unlocked, the court found the following facts indicative
of custodial interrogation: The defendant was "summoned to the
interview" and was escorted there by a guard; the defendant was
not told that the questioning was voluntary or that he was free
to leave; the defendant was, in fact, not free to leave the
interview; the atmosphere of the interview was police-dominated
because the defendant was escorted there by a guard and
questioned by a DOC investigator; and at the end of questioning,
the defendant was transferred to a higher-security area of the

Under the totality of the circumstances, Pride was subject to custodial interrogation.[25]  Acting on information he had received from a meeting hosted by the State's Attorney's Office, Arce summoned Pride from a holding cell to a small, windowless room.  Hr'g Tr. 137:22-25; 135:19-136:1.  Pride was escorted to the interview by a correctional officer, and the officer remained outside the door during the interview.  *Id*. 137:22-25.  Pride was not told that he was not required to answer questions, and he was not free to leave.  *Id*. 146:1-6.  Arce asked not only about Pride's gang membership and rank but about gang activity in Wicomico County and about whether Pride was involved in that activity.  *Id*. 145:13-22.  Although Arce reported what he learned from the interview to the WCDC's Housing Department, he also wrote a memorandum to the State's Attorney's Office.  *Id*. 138:9-11.[26]

---

prison.  *Id*. at 504.

[25] The Government does not argue that Arce's interview was not "interrogation" under *Miranda*.  Interrogation is "words or actions on the part of police officers . . . that they *should have known* were reasonably likely to elicit an incriminating response." *See Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).

Nor does the Government argue that the "routine booking question" exception to *Miranda* applies.  *See Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990) (holding that questions "to secure biographical data necessary to complete booking"--such as the suspect's name, height, weight, eye color, date of birth, and current age—"fall outside the protections of *Miranda*").

[26] That a purpose of the interview was to collect information about Pride's gang-related activity to be shared with law

The Government compares Pride to Conley and Cervantes, but those cases are distinguishable.[27] The brevity and spontaneity

---

enforcement is significant. *Conley* and *Cooper* considered the reason the defendant was in the place where the questioning occurred to be relevant to the custody analysis. That the defendants were questioned in places where they had been taken for reasons other than interrogation suggested they were not in custody when they were questioned. *See Cooper*, 800 F.2d at 414; *Conley,* 779 F.2d at 973. Unlike Conley and Cooper, Pride was taken to the place of the interview to be interrogated, that is, to be asked questions that--because they would be shared with law enforcement--Arce should have known would elicit statements that could be used in court. *See Innis*, 446 U.S. at 302 (defining interrogation).

The purpose of the interview is also significant because it distinguishes this case those when an officer could not be expected to recognize that questioning would produce statements that could later be used in court. When the questioning is spontaneous, informal, and brief--such as in *Conley* and *Cervantes*--requiring *Miranda* warnings "would risk disrupt[ing] prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards which may touch on past or future criminal activity." *Cervantes*, 589 F.2d at 427. Conversely, when, as here, the questioning officer collects information about a defendant's criminal activity for outside law enforcement, there is little risk of disruption in prison administration.

The Court does not believe--or hold that *Miranda* warnings are required before all interviews conducted by prison personnel about an inmate's gang affiliation. Eliciting information from an inmate about his gang affiliation solely for prison administrative purposes does not implicate *Miranda*. It is only when such information is used against the inmate in a prosecution that *Miranda* warnings are required.

[27] Unlike Pride, Conley was taken to a room for a purpose other than a formal interview with a correctional officer about potentially criminal activity. The conversation in *Conley*, as the Fourth Circuit notes, was informal, spontaneous, and brief; indeed, it seems to have consisted primarily of banter between acquaintances. Pride's interview, although relaxed, was clearly more formal, and a purpose was to gather information for law

of those interactions differ from Arce's formal and extensive questioning.

The Government argues that Pride's interview was not custodial interrogation because it was designed to elicit information primarily for the use of the prison in guaranteeing the safety and security of the inmates rather than interrogate Pride.[28]  Arce's interview--which elicited from Pride his gang affiliation and rank, and his connection to gang-related criminal activity in Wicomico County--was "interrogation" under *Miranda*.

The Government argues that it is significant that Pride was not handcuffed or otherwise restrained during the interview and that the door to the office remained unlocked.  Although that fact is relevant to the custody analysis, *see Cooper*, 800 F.2d at

---

enforcement.  *Id*. 138:9-11, 145:13-22.  Conley was questioned only as a witness.  Although Pride might have been questioned generally about gang activity in Wicomico County, Arce agreed that "[p]art of the questioning was to determine whether Pride himself was involved in gang-related criminal activity."  Hr'g Tr. 148:12-15.

In *Cervantes*, marijuana was uncovered in the course of a routine search while a correctional officer was moving the defendant to a new cell.  The officer's question ("What's this?") was spontaneous, and was asked to determine if a crime was in progress.

[28] The Government relies on language in *Conley* and *Cooper* stating the primary purpose of the interview is relevant to the custody analysis.  *See Conley*, 779 F.2d at 973; *Cooper*, 800 F.2d at 414. The *Conley* and *Cooper* courts found it significant that the defendants had been taken to rooms for purposes other than interrogation.  The Government argues that *Miranda* warnings are only required when the primary purpose of the interview is interrogation.

414, in light of *Mathis* (where the defendant was not restrained), it is not dispositive.  The door was unlocked, but a guard remained outside, and Pride was not free to leave.

The Government also contends that this case is distinguish-able from *Mathis* because Mathis was questioned by an outside agent about a matter that was not under investigation within the prison itself. *Mathis* is not so different from this case. Although Arce is employed by the WCDC, he works with an outside agency (the State's Attorney's Office) and provides that agency with information he learns about gang activity outside the prison that--as in this case--can be used to support prosecutions. *Mathis* supports Pride's argument that *Miranda* warnings were required before the interview began.

Under the totality of the circumstances Pride was subject to "custodial interrogation," and *Miranda* warnings were required. Because they were not given, Pride's motion to suppress will be granted.

V.    Michelle Hebron[29]

    A.    Motion to Exclude Witnesses (Paper No. 390)[30]

Hebron moves under Fed. R. Evid. 615 to exclude witnesses from the courtroom so that they cannot hear the testimony of other witnesses.  She also requests that the Court order the Government to produce a list of all witnesses who were interviewed jointly.

Under Fed. R. Evid. 615, "[a]t the request of a party, the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses."  The Court will grant any party's sequestration motion.  In its December 17, 2009 letter, the Government indicated that it was aware of only one witness who was interviewed jointly, and that it will provide information about that interview to counsel.  This aspect of the motion is therefore moot.  Accordingly, the motion will be granted in part and denied in part.

---

[29] Hebron has filed a motion for disclosure of 404(b) materials (Paper No. 391) and adopted Thomas's motion for the same (Paper No. 442). Paper No. 771.  She has also adopted Thomas's motions for disclosure of defendant's statements (Paper No. 445) and expert materials (Paper No. 446), and Fenwick's motion for disclosure of informants names (Paper No. 436).  Paper No. 771. In its December 17, 2009 letter, the Government informed the Court that the materials requested in these motions have been or will be disclosed to Hebron before trial.  Accordingly, the motions will be denied.

[30] Thomas (Paper No. 679) and Pride (Paper No. 681) have adopted this motion.

B.    Hebron's Motion to Strike Overt Act 83 (Paper No. 774)[31]

Hebron moves to strike Overt Act 83 under Count One, the October 5, 2007 murder of David Moore, arguing that the Government has insufficient evidence that the murder was part of a racketeering conspiracy.  The Indictment indicates that the grand jury found Moore's murder to be an overt act in furtherance of the enterprise described in Count One.  As discussed above, the Court does not make a pretrial assessment of the sufficiency of the evidence against a defendant.  *See United States v. Mills*, 995 F.2d 480, 487 (4th Cir. 1993).  Accordingly, the motion will be denied.  If at trial the Government fails to connect the alleged murder to the alleged racketeering conspiracy, the motion may be renewed and an appropriate jury instruction given.

---

[31] Hebron moved for leave to file this motion and her motion in *limine* regarding gang experts (Paper No. 773) out of time.  Paper No. 772.  As the Government has not opposed the motion for leave, it will be granted.

Pride (Paper No. 681) and Thomas (Paper No. 687) adopted Fleming's similar motion to strike Overt Act 3, the alleged murder of Lamont Jackson by Fleming and Mouzone (Paper No. 572). The Government has stated that it will not introduce evidence of the Jackson murder at the January 19, 2010 trial.  Paper No. 785. Pride's and Thomas's motions are moot and will be denied. Similarly, Pride and Thomas adopted Mouzone's motions to suppress firearms testimony (Paper Nos. 565, 566) in connection with the Jackson murder.  Those adopted motions (Paper Nos. 681 and 679)

C.    Motion in *Limine* Regarding Firearms Identification
      Testimony (Paper No. 771)

Hebron has adopted Mouzone's motions to suppress firearms
identification testimony (Paper Nos. 565, 566).  Mouzone's
motions challenged the admissibility of testimony by Sgt. Mark
Ensor of the Baltimore County Police Department, who was to
testify that shell casings recovered at the scenes of two
murders in which Mouzone was allegedly involved came from the
same firearm.  Ensor's conclusion was based on "toolmark
identification" analysis.  *See generally United States v.
Mouzone*, 2009 WL 3617748 (D. Md. Oct. 29, 2009) (Report and
Recommendation by Chief Mag. Judge Paul W. Grimm).  Mouzone's
motions argued that such analysis was unreliable--and thus
inadmissible--under Fed. R. Evid. 702 and *Daubert v. Merril Dow
Pharms.*, 509 U.S. 579 (1993).  The motions were referred to
Chief Magistrate Judge Paul W. Grimm, who, after an October 26,
2009 hearing, recommended that Ensor be permitted to testify but
not to express his conclusions with any degree of certainty.
Judge Grimm's October 29, 2009 Report and Recommendation (Paper
No. 721)--and Mouzone's exceptions (Paper No. 732)--are still
pending and will not be addressed here because they concern the
March 22, 2010 trial.

By adopting Mouzone's motion, Hebron intended to challenge

will also be denied as moot.

the toolmark identification testimony of Arnold Esposito of the Maryland State Police regarding her alleged murder of David Moore on October 5, 2007. Esposito would testify that based on his analysis, toolmarks on a shell casing and bullet fragment recovered from the scene of Moore's murder match toolmarks on a shell casing and bullet fired from a gun found in Hebron's apartment. Paper No. 782. The parties agree that Esposito's testimony regarding the match is admissible. Telephone Conference Call with Assistant United States Attorney Michael Hanlon and Richard Bardos, Esq. (December 29, 2009). Further, they agree that Esposito should not be able to state his conclusions regarding the match with any degree of certainty. *Id*. The parties dispute whether Esposito may testify that, based on his conclusion regarding the match, it is his opinion that the gun found in Hebron's apartment *fired* the shell casing and bullet fragment recovered at the crime scene.

Expert testimony is admissible under Fed. R. Evid. 702 if "it rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597. Although the reliability of toolmark identification has been challenged in recent years, there is no reported case in which a court has held such testimony inadmissible.[32]

---

[32] *See United States v. Monteiro*, 407 F. Supp. 2d 351, 364 (D. Mass. 2006). Courts have, however, limited the degree of certainty with which a toolmark examiner may express his or her

The courts have permitted toolmark experts to conclude that shell casings and/or bullets were fired from a particular firearm.[33]  The Court will allow Esposito to opine that the gun found in Hebron's apartment fired the cartridge and bullet fragment recovered from the scene of Moore's murder.  The parties have agreed that Esposito should not be permitted to express his opinions with any degree of certainty.  The Court concludes that this limitation--and cross-examination--will permit the jury to appropriately evaluate Esposito's testimony. Accordingly, Hebron's motion will be denied.

> D.    Motion in *Limine* Regarding Gang Experts (Paper No. 773)

Hebron also raises a Fed. R. Evid. 702 challenge to two Government witnesses who will testify as "gang experts."  The Government intends to call Detective Christopher Hodnicki of the

---

conclusions.  *See United States v. Taylor*, 2009 WL 3347485, *9 (D.N.M. Oct. 9, 2009) (expert may only testify to conclusions to "reasonable degree of scientific certainty"); *United States v. Glynn*, 578 F. Supp. 2d 567, 575 (S.D.N.Y. 2008) (expert's conclusions may be stated "in terms of 'more likely than not'"); *United States v. Diaz*, 2007 WL 485967, at *11 (N.D. Cal. Feb. 12, 2007) (expert may only testify to "reasonable degree of ballistic certainty"); *Monteiro*, 407 F. Supp. 2d at 375 (same).

[33] *See Taylor*, 2009 WL 3347485, at *9 (expert could "testify that, in his opinion, the bullet came from the suspect rifle"); *Glynn*, 578 F. Supp. 2d at 569 (expert could "give an opinion that . . . the bullet and casings came from the guns in question"); *Diaz*, 2007 WL 485967, at *11 (experts could testify that "cartridge cases or bullets were fired from a particular firearm"); *Monteiro*, 407 F. Supp. 2d at 375 (expert could testify that "cartridge cases were fired from a particular firearm").

Baltimore County Police Department and Detective Joseph Fender of the Los Angeles County Sheriff's Department.  Hodnicki will testify about the formation of gangs in Maryland and the history, practices, structure and symbology of the TTP.  Fender will testify about the formation of the Bloods gang in California, the gang's movement across the country, the Bloods' hierarchy, and the difference between East Coast and West Coast Bloods' sets. Hebron moves to exclude this testimony as unreliable under Rule 702.  In the alternative, she requests a pretrial *Daubert* hearing.

As noted above, expert testimony is admissible under Rule 702 if "it rests on a reliable foundation and is relevant." *Daubert*, 509 U.S. at 597.[34]  "[T]he law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).

After the Government has proffered its experts' testimony, Hebron will be permitted an opportunity to *voir dire* Detectives

---

[34] In *Daubert*, the Supreme Court listed a number of factors--such as peer review, testing, error rates, and acceptance in the relevant scientific community--meant to assist the trial judge in making the reliability determination.  *See id*. at 593-94.  *Kumho Tire Co*. made it clear that, although *Daubert*'s "general holding"--that a trial judge must act as a "gatekeeper" by ensuring that expert testimony is reliable and relevant--applied to non-scientific testimony, *Daubert*'s list of factors "neither necessarily nor exclusively applies to all experts or in every

41

Hodnicki and Fender on their qualifications and expertise. The
Court will then determine whether they are qualified to testify
as experts. If the detectives are permitted to testify, Hebron
will then have the opportunity to test the detectives' knowledge
and credibility on cross-examination.

Hebron also requests that the Government supplement its
disclosures under Rule 16(a)(1)(G) to include "the bases and
reasons for [the] opinions" of the expert witnesses. Fed. R.
Crim. P. 16. Under Rule 16(a)(1)(G), "[a]t the defendant's
request, the government must give the defendant a written summary
of any testimony that the government intends to use under Rule[]
702." *Id.* "The summary . . . must describe the witness's
opinions, the bases and reasons for those opinions, and the
witness's qualifications." *Id.*

The Government satisfied Rule 16's summary requirements in
its Opposition to Hebron's motion.[35] As stated above, Hebron

---

case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).
[35] As to the bases and reasons for Fender's proposed testimony
about the history, expansion and hierarchy of the Bloods, the
Government averred that Fender has personally participated in
investigations of the Bloods in California and has developed a
personal familiarity with the gang. Gov.'s Opp. 8. Fender's
*curriculum vitae* states that during the past three years, he has
investigated hundred of gang-related offenses; has had thousands
of contacts with gang members, their families and associates; and
has arrested or been involved with the arrest of hundreds of gang
members. Gov.'s Opp., Ex. 1. Similarly, the Government has
stated that Hodnicki is familiar with the formation, structure
and operations of the TTP in Maryland from his own investigations
and from studies of other investigations. Gov.'s Opp. 10. In
other words, Hodnicki's and Fender's testimony will be based on

will be permitted to *voir dire* both putative experts to test the limits of the knowledge they claim.  The Government has provided sufficient disclosures under Rule 16 to enable her to do so.  Accordingly, insofar as the motion requests relief under Rule 16, it will be denied.

January 7, 2010                              _____/s/_____
Date                                         William D. Quarles, Jr.
                                             United States District Judge

---

the knowledge of the Bloods that they have gained through their experiences; their experience as investigators provides the "bases and reasons" for the opinions they will give.